**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RYAN PHARAOH,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **OFFICER JOSHUA DEWEES, and** | **NO.  14-3116** |
| **THE CITY OF CHESTER,** | |
| **Defendants.** | |

**M E M O R A N D U M**

DuBois, J.                                                                                        **May 4, 2016**

### I.    INTRODUCTION

This case arises from the arrest of plaintiff Ryan Pharaoh by defendant Officer Joshua Dewees of the City of Chester's Police Department on June 5, 2012.  Pharaoh asserts claims against Dewees for use of excessive force, false detention, and false arrest in violation of the Fourth Amendment under 42 U.S.C. § 1983, and claims for assault and battery and intentional infliction of emotional distress under state law.  Plaintiff also asserts a *Monell* claim under § 1983 against the City of Chester ("the City").

Presently before the Court are the City's Motion for Summary Judgment as to plaintiff's *Monell* claim and Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Witness, Dr. William Jantsch.  For the reasons that follow, the Court grants the City's Motion for Summary Judgment and denies Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Witness.

II.    **BACKGROUND**

A.    **Facts**[1]

Dewees has been employed as a police officer by the City since 2006.  Statement of Material Facts on Behalf of Def., City of Chester ("Def.'s SOF") ¶ 14; Resp. of Pl., Ryan Pharaoh to Def., City of Chester's Mot. for Summ. J. ("Pl.'s SOF") ¶ 14.

On or about June 5, 2012, Pharaoh was standing in an alleyway in the City of Chester, Pennsylvania.  Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2; Mot. for Summ. J. of Def., the City of Chester ("Def.'s SJ Mot."), Ex. B Dep. of Ryan A. Pharaoh, at 26:22-27:7.  Pharaoh saw a police cruiser driving toward him down the alleyway.  Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3.  Dewees was driving the police cruiser.  Pharaoh walked away from the cruiser and out of the alleyway into an area between two homes.  Def.'s SOF ¶¶ 4-5; Pl.'s SOF ¶¶ 4-5.

Pharaoh then turned around and observed Dewees approaching on foot with his firearm drawn.  Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7.  Dewees ordered Pharaoh to lay on the ground and put his hands behind his back, and Pharaoh complied.  Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8.  While Pharaoh was on the ground with his hands behind his back, Dewees struck him in the face with an unidentified black object.  Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9.  Pharaoh's jaw was broken in two places, and Dewees transported him to the hospital where he underwent surgery.

B.    **Procedural History**

Pharaoh filed this action on June 3, 2014.  In the Complaint, he asserted claims against Dewees for excessive force, false detention, false arrest, and malicious prosecution in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count I), and state law claims for assault and battery (Count III), malicious prosecution (Count IV), and intentional infliction of emotional

---

[1] All facts are taken from the parties' statements of facts, summary judgment filings, and attached exhibits.  As required on a motion for summary judgment, the facts are interpreted in the light most favorable to the nonmoving party.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

distress (Count V).  Compl. ¶¶ 15-19, 24-29.  Pharaoh also asserted a *Monell* claim against the

City for municipal liability under § 1983 (Count II).  Compl. ¶¶ 20-23.

On September 9, 2014, defendants moved to dismiss the malicious prosecution claims

under Federal Rule of Civil Procedure 12(b)(6).  Defs.' Partial Mot. to Dismiss Pursuant to Fed.

R. Civ. P. 12(b)(6).  In response, Pharaoh stipulated to the dismissal with prejudice of his claims

for malicious prosecution under both state law and § 1983.  Mot. of Voluntary Dismissal of Pl.'s

Claims for Malicious Prosecution under Pa. State Law and 42 U.S.C.A. § 1983.  By Order dated

September 26, 2014, the Court granted Pharaoh's Motion to voluntarily dismiss his malicious

prosecution claims asserted in Counts I and IV of the Complaint and denied Defendants' Partial

Motion to Dismiss as moot.

After discovery, on September 18, 2015, the City filed a Motion for Summary Judgment

as to Pharaoh's *Monell* claim.  On September 22, 2015, defendants filed a Motion to Exclude the

Testimony of Plaintiff's Expert Witness, Dr. William Jantsch.  Plaintiff filed Responses in

opposition to both motions.  The Court addresses each motion in turn.

## III.   MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

The Court will grant a motion for summary judgment if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A factual

dispute is material when it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  In

considering a motion for summary judgment, "the court is required to examine the evidence of

record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support a claim.  *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted).  The party asserting a fact "must support the assertion by . . . citing to particular parts of material in the record."  Fed. R. Civ. P. 56(c)(1)(A).  The party moving for summary judgment is entitled to judgment as a matter of law if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

>     **B.**     **Analysis**

>     Plaintiff avers that the City was "on actual notice of a need to train, supervise, discipline or terminate defendant Officer Dewees" because he had used excessive force in the past, that the City had a custom of "acquiesc[ing]" in Dewees's repeated use of excessive force, and that the City had a custom of "fail[ing] to discipline, train, supervise or otherwise sanction police officer Joshua Dewees. . . thus encouraging defendant Officer Dewees in this case to engage in [] unlawful and actionable conduct . . . ."  Compl. ¶¶ 21-23; Mem. of Law of Pl., Ryan Pharoah [sic] in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s SJ Resp."), at 7.

>     The City argues that it is entitled to summary judgment because plaintiff has no evidence to support his *Monell* claim.  Def.'s SJ Mot. at 6.  Specifically, the City states that "[p]laintiff has not developed any evidence regarding the City's supervisory or disciplinary procedures, has not taken any discovery on that subject, and has not proffered any expert witness to testify regarding alleged shortcomings in the City's disciplinary or supervisory procedures."  *Id.* at 11.  Plaintiff

responds that summary judgment is inappropriate because evidence of Dewees's history of violating Police Department policies and prior excessive force lawsuits against Dewees are sufficient to establish his *Monell* claims.  *See* Pl.'s SJ Resp.

For the following reasons, the Court grants the City's Motion for Summary Judgment.

1. Evidence of Record

Plaintiff has produced two categories of evidence in support of his *Monell* claims: (1) evidence of Dewees's disciplinary history with the City of Chester's Police Department, and (2) five previous excessive force lawsuits filed in the United States District Court for the Eastern District of Pennsylvania.  The Court addresses this evidence in turn.

The first category of evidence shows that Dewees was disciplined numerous times for minor infractions (such as misusing his sick time, failing to write a report, or failing to sign in) and more serious violations (such as insubordination and incidents involving vehicular accidents) that are unlike the alleged excessive force at issue in this case.  *See* Pl.'s SJ Resp., Ex. A; Reply Brief of Def., the City of Chester, in Supp. of Mot. for Summ. J. ("Def.'s SJ Reply"), Ex. B. One such piece of evidence discloses that Dewees was disciplined in connection with an incident on December 30, 2007, during which Dewees arrested a witness to an automobile accident. Def.'s SJ Reply, Ex. A.  A second witness filed a civilian complaint about Dewees's rude demeanor during this incident; the complaint did not allege that Dewees used excessive force. *Id.*  After an investigation, the Police Department suspended Dewees for using rude language. *Id.*; Pl.'s SJ Resp., Ex. A.

The second category of evidence demonstrates that Dewees and the City were named as defendants in five lawsuits in the United States District Court for the Eastern District of Pennsylvania in which plaintiffs alleged that Dewees used excessive force.  Def.'s SJ Mot., Exs.

D-O.  The lawsuits concerned incidents that allegedly occurred between January 15, 2007 and

January 2, 2011, and were filed between 2009 and 2012.  *Id.*  One excessive force lawsuit arose

out of the same December 30, 2007 incident that was reported in the civilian complaint to which

reference is made above.  *See id.*, Ex. F; Def.'s SJ Reply, Ex. A.  Of the five lawsuits, three were

settled by the City without an admission of liability and dismissed.  Def.'s SJ Mot., Exs. E, G, M.

In two of the three settled cases, Dewees was dismissed as a defendant before the settlement was

finalized and the City dismissed.  *Id.* at Exs. E, L.  The other two cases were tried to juries, both

of which returned verdicts in favor of defendants.  *Id.* at Exs. I, O.  None of these lawsuits

resulted in a factual finding that Dewees used excessive force or otherwise violated the

constitutional rights of any individual.  Four of the five lawsuits were filed by the same attorney,

plaintiff's attorney in this case; the fifth lawsuit was filed *pro se.*

       2. <u>Law Governing *Monell* Claims</u>

The liability of a municipality under 42 U.S.C. § 1983 is governed by *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978).  Municipalities cannot be found vicariously

liable under the doctrine of *respondeat superior* for claims that their employees violated an

individual's civil rights.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403

(1997).  Rather, a plaintiff seeking to hold a municipality liable for a civil rights violation caused

by a municipal employee must prove (1) the existence of a custom or policy of the municipality

(2) pursuant to which the municipality's employee violated the plaintiff's civil rights.  *Monell*,

436 U.S. at 694; *see also Bryan Cnty.*, 520 U.S. at 403; *Berg v. Cnty. of Allegheny*, 219 F.3d 261,

275 (3d Cir. 2000).

A municipal "policy" may arise from the "decisions of [a municipality's] duly constituted

legislative body or of those officials whose acts may fairly be said to be those of the

municipality." *Bryan Cnty.*, 520 U.S. at 403-04.  A municipal "custom" is a practice that is "so widespread as to have the force of law," though the practice "has not been formally approved by an appropriate decisionmaker." *Id.* at 404.  After establishing that a specific government policy or custom exists, a plaintiff must prove that "the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (requiring the municipality's deliberate conduct to be the "'moving force' behind the injury alleged").  If the alleged municipal action does not facially violate federal law, a plaintiff must demonstrate that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Berg*, 219 F.3d at 276 (quoting *Bryan Cnty.*, 520 U.S. at 407).  "A showing of simple or even heightened negligence [is] not suffic[ient]" to prove deliberate indifference.  *Bryan Cnty.*, 520 U.S. at 407.

*Monell* liability can be predicated upon the theory that the municipality's failure to train its employees "reflect[s] a deliberate or conscious choice by policymaking officials, such that one could call it the [municipality's] policy or custom." *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 1359.  A plaintiff usually must provide evidence that the alleged failure to train has caused a "pattern of violations." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010).  In addition, "a § 1983 plaintiff pressing a claim of this kind must identify a failure to provide

specific training that has a causal nexus with his or her injury[.]" *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991); *see also Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014) ("Causation is a requirement. . . that is separate from deliberate indifference. . . .").

3. <u>Application</u>

Plaintiff offers the same evidence in support of his claims that the City had customs of (1) failing to discipline and supervise Dewees, (2) acquiescing in his use of excessive force, and (3) failing to train Dewees.  The Court concludes that the City's Motion for Summary Judgment must be granted because the evidence presented does not support plaintiff's *Monell* claims.  *See Celotex*, 477 U.S. at 322-23.  Specifically, the evidence of Dewees's disciplinary history is irrelevant because it discloses no incidents which are similar to the allegations in this case that Dewees used excessive force.  Further, the five settled or dismissed lawsuits contain no finding that Dewees used excessive force and thus are insufficient to demonstrate that Dewees had a history of using excessive force or that the City was on notice of such a history.  In short, the evidence presented fails to establish any of the alleged customs.  There is no evidence of prior incidents of excessive force by Dewees and thus no custom of acquiescence in his excessive use of force in making arrests, there is no evidence of a custom of failing to supervise or discipline Dewees for prior incidents of excessive use of force in making an arrest, and no evidence of failing to train Dewees with respect to permissible force in making an arrest after notice of any need for such training.  The Court will address these issues in turn.

*(a.)  Plaintiff's Evidence Does Not Support his <u>Monell</u> Claims*

The first category of evidence—Dewees's disciplinary history at the Police Department—is irrelevant to plaintiff's *Monell* claims.  Internal civilian complaints can provide evidence of a pattern of potential constitutional violations and support an inference that a

8

municipal decisionmaker had notice of such a pattern. *See, e.g.*, *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (1996). However, "mere recitation of the number of complaints filed [does not] suffice to prove a policy or custom. A plaintiff must show why those prior incidents deserved discipline and how the misconduct in *those cases* is similar to that involved in the *present action*." *Mariani v. City of Pittsburgh*, 624 F. Supp. 506, 511 (W.D. Pa. 1986) (emphasis added); *see also Artiles v. Vitanza*, No. 06 Civ. 5427, 2009 WL 2426259, at *28-30 (D.N.J. Aug. 6, 2009).

The misconduct for which Dewees was disciplined bears no resemblance to the misconduct that allegedly occurred in this case. Dewees's history of misusing sick days and failing to sign in is unrelated to whether he had a history of using excessive force in making arrests. The civilian complaint arising out of the December 30, 2007 incident stated that Dewees used rude language, but there is no reference to excessive force in making the arrest. Dewees's disciplinary history is thus irrelevant to his alleged pattern of using excessive force.

The second category of evidence—prior excessive force lawsuits against Dewees and the City—likewise does not support plaintiff's *Monell* claims. Many courts "have held that a plaintiff's citation to a few lawsuits involving claims of alleged constitutional violations is not probative of the existence of an underlying policy by a municipality." *Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 543-44 (S.D.N.Y. 2015) (alteration omitted); *see also Ameduri v. Vill. of Frankfort*, 10 F. Supp. 3d 320, 341 (N.D.N.Y. 2014) (holding that evidence that prior lawsuits were filed, standing alone, "is not probative of the existence of an underlying policy by a municipality [or] Police Department"). For this reason, the fact that lawsuits against Dewees were filed, "without more, indicates nothing," as "people may file a complaint for many reasons, or for no reason at all," and evidence that "they filed complaints does not indicate that

the policies that [plaintiff] alleges exist do in fact exist. . . ."  *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985).

To impose liability on a municipality more information about such lawsuits is required, such as whether they resulted in a finding that a constitutional violation occurred and whether the municipality's response to the suits could demonstrate deliberate indifference to the risk of future constitutional violations.  *See Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 346 (E.D.N.Y. 2006); *Hernandez v. Nielson*, No. 00 Civ. 50113, 2002 WL 31804788, at *1 (N.D. Ill. Dec. 13, 2002) (holding that settled lawsuits in which "there was never any finding of liability on the officers' part," could not show that the municipality "maintain[ed] a widespread practice of allowing its officers to use excessive force").

In this case, the evidence of the five prior excessive force lawsuits against Dewees and the City does not support plaintiff's *Monell* claims.  The two lawsuits that resulted in jury verdicts for the defendants do not support plaintiff's claims that the City was aware that Dewees had a history of constitutional violations because the triers of fact determined that Dewees committed no such violation.  *Cf. Artiles*, 2009 WL 2426259, at *29 ("When every prior incident implicating the Constitution is dismissed as false or without factual basis, the municipality should hardly have been on notice that a constitutional violation was likely to occur.").  The remaining three cases, all of which were settled, likewise did not result in a finding that Dewees used excessive force in making an arrest or otherwise violated the Constitution.  Indeed, in two of the three settled cases, Dewees was dismissed as a defendant before the settlement was finalized and the City dismissed.  In short, the settled cases do not establish that Dewees's actions constituted a pattern of using excessive force.  *See Morais v. City of Phil.*, No. 06 Civ. 582, 2007 WL 853811, at *9 (E.D. Pa. Mar. 19, 2007) (holding that plaintiff could not establish a

pattern because there was no evidence that two prior incidents "represent[ed] constitutional violations, rather than proper exercise of deadly force by the police," and granting summary judgment in favor of defendant on *Monell* claim); *Hernandez*, 2002 WL 31804788, at *1 (granting summary judgment for municipal defendant when plaintiff's only evidence was a history of settled excessive force lawsuits against individual officers). Thus, neither the disciplinary record nor the lawsuits offered by plaintiff support his *Monell* claims.

> *(b.) Plaintiff Has Produced No Evidence Supporting his Claims that the City had Customs of Failing to Supervise or Discipline Dewees for the Use of Excessive Force or of Acquiescing in Dewees's Use of Excessive Force*

Plaintiff has not presented any evidence of prior incidents of Dewees's use of excessive force in making an arrest. Absent such evidence, plaintiff cannot show that the City had customs of acquiescing in Dewees's use of excessive force or of failing to supervise or discipline him with respect to prior incidents in which he used excessive force.

Plaintiff argues that his case is similar to *Beck v. City of Pittsburgh*, 89 F.3d 966 (1996). *See* Pl.'s SJ Resp. at 12. In that case, the plaintiff claimed that the City "tolerated and acquiesced in a custom of excessive use of force by its police officers by permitting a situation to exist where police officers were not disciplined or subject to review for the use of excessive force against citizens." *Beck*, 89 F.3d at 971. In *Beck*, after the plaintiff presented the evidence in support of his *Monell* claim at trial, the district court determined it was insufficient and entered judgment for the defendant under Federal Rule 50(a). *Id.* at 967. The United States Court of Appeals for the Third Circuit reversed, holding that plaintiff's evidence, which consisted of (a) civilian complaints that the officer had used excessive force in the past, (b) testimony that the City investigated these complaints and transmitted them to the Chief of Police (who therefore had knowledge of them), (c) testimony that the City's investigation method failed to track and account for patterns of similar complaints against individual officers, and (d) an internal report

11

stating that the entire police department had a problem with excessive force, was sufficient to require submission of the case to the jury. *Id.* at 973-75.

The Court rejects plaintiff's argument that this case is similar to *Beck*. Plaintiff has only provided the Court with evidence of Dewees's irrelevant disciplinary record and five lawsuits against Dewees, none of which resulted in a finding that he used excessive force. Much more evidence was presented in *Beck*: a history of excessive force complaints against the officer *and* testimony from officers in the police department's investigative branch that investigations of new civilian complaints only considered an officer's prior conduct under limited circumstances, thereby making it unlikely that the department would notice potential patterns of unconstitutional behavior, and internal departmental reports that stated excessive force was common and that "[a]ctual discipline for excessive force is very low." *Beck*, 89 F.3d at 968-70. Significantly, in this case plaintiff has provided no evidence of the City of Chester's Police Department's response to the excessive force lawsuits against Dewees.

*(c.) Plaintiff Has Produced No Evidence to Support his Claim that the City had a Custom of Failing to Train Dewees on the Use of Excessive Force*

Finally, plaintiff has presented no evidence to support his *Monell* claim under a failure to train theory. There is no evidence identifying "a particular omission in the[] training program," no evidence identifying a municipal decisionmaker who was "on actual or constructive notice" of that omission, no evidence showing that the decisionmaker—despite such notice—chose to maintain an inadequate training program, and no evidence implying that any such decision caused plaintiff's injury. *See Kelly*, 622 F.3d 248, 265 (3d Cir. 2010); *Artiles*, 2009 WL 2426259, at *29 ("Having not discussed at any length the training or supervision the defendant officers received, [plaintiff] has not met her heavy burden to show that a failure to adequately train or supervise resulted in her injuries."). Indeed, it appears that plaintiff conducted no

discovery of Dewees's training on the use of force in making an arrest or how the City's police officers are trained in general.  On this record, plaintiff will not be allowed to proceed on his *Monell* claim under a failure to train theory.

*(d.) Conclusion*

Because plaintiff has "fail[ed] to make a showing sufficient to establish the existence of" many "element[s] essential to [his] case, and on which [he] will bear the burden of proof at trial," the City is entitled to judgment as a matter of law on plaintiff's *Monell* claim.  *Celotex*, 477 U.S. at 322-23.  Accordingly, the Court grants the City's Motion for Summary Judgment.

## IV.    MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS

### A.    Legal Standard

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 has "a liberal policy of admissibility."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Inter., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  As such, the "rejection of expert testimony is the exception and not the rule."  Fed. R. Evid. 702 advisory committee's note.

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("*Paoli II*"))).  In this case, defendants challenge only the reliability of plaintiff's causation expert.  The reliability requirement of *Daubert* "means that the expert's opinion must be based on the 'methods and

procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert

must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742 (quoting *Daubert v.*

*Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993)).  The Supreme Court held in *Kumho Tire* that

the *Daubert* test of reliability is "flexible" and "the law grants a district court the same broad

latitude when it decides how to determine reliability as it enjoys in respect to its ultimate

reliability determination." *Kumho Tire v. Carmichael*, 526 U.S. 137, 141-42 (1999) (emphasis

omitted).  In determining whether the reliability requirement is met, courts examine the

following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the
> method has been subject to peer review; (3) the known or potential rate of
> error; (4) the existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is generally accepted;
> (6) the relationship of the technique to methods which have been
> established to be reliable; (7) the qualifications of the expert witness
> testifying based on the methodology; and (8) the non–judicial uses to
> which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *Paoli II*, 35 F.3d at 742 n. 8).

This list is not exhaustive and all the factors are not applicable in every case.  *Kannankeril*, 128

F.3d at 806–07.

Under the *Daubert* reliability prong, the party proffering the expert "do[es] not have to

demonstrate to the judge by a preponderance of the evidence that the assessments of their experts

are correct, they only have to demonstrate by a preponderance of evidence that their opinions are

reliable." *Paoli II*, 35 F.3d at 744 (emphasis omitted).  "The evidentiary requirement of

reliability is lower than the merits standard of correctness." *Id.*  "As long as an expert's

scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by

the adversary process—competing expert testimony and active cross–examination—rather than

excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily

14

weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (quoting *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

**B.      Analysis**

Defendants challenge the reliability of the opinion of plaintiff's expert, Dr. William Jantsch, that plaintiff's injury was caused by a blunt force and not by a fall on his chin. Defendants' Motion asserts that "Dr. Jantsch's opinions are based on incorrect or unsupported factual assumptions, and his methodology is simply the application of his anecdotal observations based upon a relatively small number of patients on which he lacked vital information to determine the mechanisms of the injuries." Defs.' Brief in Support of Mot. to Exclude the Testimony of Pl.'s Expert Wit., Dr. William Jantsch ("Defs.' Brief"), at 9. The Court disagrees with defendants, and concludes that Dr. Jantsch's methodology and professional experience are reliable bases for his opinion.

Dr. Jantsch is a medical doctor who is board certified in emergency medicine and internal medicine. Defs.' Brief, Ex. C, at Ex. J-1. His expert report states that, after reviewing the deposition testimony of plaintiff and Dewees, a photograph taken of plaintiff after he was admitted to the hospital, and plaintiff's medical records, it is his opinion to a degree of "reasonable medical certainty":

- "that the mandibular fractures sustained by Mr. Pharaoh were caused by the application of direct blunt force to the left side of his jaw. It is also my opinion that this injury was caused by a closed fist or heavy object, such as a baton or flashlight;" and

- ". . . that this injury is not at all likely to have been caused by a fall onto the face, as such a fall would have necessarily resulted in extensive soft tissue injury to the face and chin. . . which were clearly not evident on a photograph taken after Mr. Pharaoh was injured. . . [and] no mention is made in the medical record from Chester Hospital of any such soft tissue injury." *Id.* at Ex. J-2.

Defendants argue that, at his deposition, Dr. Jantsch did not clearly answer what methodology he used to arrive at his opinion, *see id.*, at 20:1-22, and that Dr. Jantsch's methodology was "simply" the application of "his first hand, anecdotal observations as a physician as if those experiences qualified as peer reviewed, tested and verifiable data." Defs.' Brief at 11. To support this argument, defendants rely on the following exchange from Dr. Jantsch's deposition:

> Q: Is it fair to say that the sole source of your understanding as to the cause of the fractures Mr. Pharaoh sustained come from your experience as a doctor, as a treating physician?
>
> A: That and reading medical texts, yes and medical references.

Defs.' Brief, Ex. C at 41:5-10. Aside from this exchange, however, Dr. Jantsch's deposition testimony details the analysis he performed in order to reach his opinion, and reveals that he used a common methodology employed by medical physicians in his field: differential diagnosis.

"Differential diagnosis. . . is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). "Differential diagnosis. . . is 'the basic method of internal medicine.'" *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (quoting *Paoli II*, 35 F.3d at 755). "The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable." *Kannankeril*, 128 F.3d at 807, *as amended* (Dec. 12, 1997). Further, "a proper differential diagnosis is a reliable scientific method under *Daubert*. . . even where the expert never performed a physical examination of the injured party." *Wolfe v. McNeil-PPC, Inc.*, No. 07 Civ. 348, 2011 WL 1673805, at *4 (E.D. Pa. May 4, 2011) (DuBois, J.).

16

The documents relied upon by Dr. Jantsch support the fact that he used differential diagnosis: he relied on the charts and records created and medical history taken from plaintiff at the hospital, reviewed the report from the CT scan of plaintiff's jaw, and obtained additional historical information from the depositions of plaintiff and Dewees.  *See* Def.'s Brief, Ex. C, at Ex. J-2.

Dr. Jantsch's deposition testimony demonstrates that he used the information contained in these documents and his expertise in medicine to rule out the defendants' proffered cause of injury—that plaintiff fell when tackled—and to rule in what he considered to be the most likely cause—plaintiff being struck by a heavy object.  Specifically, Dr. Jantsch ruled out the potential that plaintiff's jaw was broken by hitting his chin on the ground because there was no external soft tissue injury (such as bruising or bleeding) to plaintiff's chin, because a fall to the side of plaintiff's face would be unlikely to break his jaw due to the diffusion of the impact through the entire head, and in light of the fact that someone who falls forward would not turn their head to the side as they fell and instead would attempt to break their fall with their hands.  *See id.* at 38:24-40:15.  Dr. Jantsch ruled in the likelihood that plaintiff's jaw was broken by being struck with the rounded edge of a heavy object because his jaw broke in two places with no comminuted fractures (or "comminutia"),[2] and because there was no injury to the soft tissue around plaintiff's jaw.  *See id.* at 21:23-23:16, 30:16-31:16.

Defendants argue that Dr. Jantsch "has not provided a testable hypothesis, his opinions have not been subject to peer review, [and] there is no data on the error rate of his methods." Def.'s Brief at 12.  That argument ignores that "differential diagnosis generally is a technique that has widespread acceptance in the medical community, has been subject to peer review, and

---

[2] Dr. Jantsch testified that comminuted fractures or "comminutia" are "multiple fractures within the body of the jaw without remote fractures elsewhere."  Defs.' Brief, Ex. C at 21:9-11.

does not frequently lead to incorrect results."  *Paoli II*, 35 F.3d at 758.  Thus, the Court

concludes that the methodology employed by Dr. Jantsch is reliable under *Daubert* because it

has been subject to peer review, is known to have a low rate of error, is generally accepted, and

is primarily used outside the judicial context to diagnose patients and the causes of their injuries.

*See Heller*, 167 F.3d at 154 (noting that "a differential diagnosis. . . properly performed, would

generally meet the requirements of *Daubert* and *Paoli*.").

　　In addition, contrary to defendants' argument, the fact that Dr. Jantsch testified that his

opinion was based on his experience as an emergency physician supports the admissibility of his

testimony.  "Nothing [in Rule 702] is intended to suggest that experience alone—or experience

in conjunction with other knowledge, skill, training or education—may not provide a sufficient

foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates

that an expert may be qualified on the basis of experience."  Fed. R. Evid. 702, advisory

committee's note; *see also Kumho Tire*, 526 U.S. at 156 ("But no one denies that an expert might

draw a conclusion from a set of observations based on extensive and specialized experience.").

　　Defendants also insist that two statements in Dr. Jantsch's deposition demonstrate that his

methodology was flawed.  Specifically, Dr. Jantsch admitted that:

- a blow to the side of the jaw with a blunt object could cause a comminuted fracture and external bruising, *see* Def.'s Brief, at 7, 13, Ex. C at 23:17-24; and

- it would be impossible to know for certain whether impact from a blunt object would be more or less likely to cause bruising without certain information (such as the amount of force, the angle, the speed, and the exact shape of the object used to strike the jaw), which was unavailable to him when he rendered his opinion, *id.* at 24:1-15, 25:3-14, 26:4-8.

　　The Court rejects defendants' argument.  The unavailability of certain information that

would have been useful to an expert does not make his opinion, rendered without that

18

information, inadmissible. *See Kannankeril*, 128 F.3d at 807 ("Indeed, as we held in *Paoli*, 'to the extent that the district court concluded otherwise [*i.e.*, that a differential diagnosis made on less than all types of information cannot be reliable], we hold that it abused its discretion.'" (alteration in original) (quoting *Paoli II*, 35 F.3d at 759)).  This is particularly true when the methodology employed by the expert does not typically require such information. *See Heller*, 167 F.3d at 155 ("[E]xperience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of a patient's family, personal, and medical histories, and a thorough physical examination are the tools of the trade, and should suffice for the making of a differential diagnosis . . . .").  Dr. Jantsch's testimony that this information would have been useful to him is only relevant to the weight that his opinion should be given, not to its admissibility. *See Mitchell*, 365 F.3d at 244 ("As long as an expert's scientific testimony rests upon good grounds, *based on what is known*, it should be tested by the adversary process— competing expert testimony and active cross–examination. . . ." (internal quotation marks omitted) (emphasis added)).  Moreover, defendants' argument based on these parts of Dr. Jantsch's deposition testimony can be covered in cross-examination at trial.

The Court concludes that Dr. Jantsch's opinions that the impact of a rounded object, and not a fall on the chin, was the cause of plaintiff's injury is based on the proper application of a reliable methodology.  Accordingly, the Court denies Defendants' Motion to Exclude Dr. Jantsch's opinions.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants the City's Motion for Summary Judgment and denies defendants' Motion to Exclude Plaintiff's Expert.  An appropriate order follows.